

FILED
DEC 21 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CYNTHIA FRAMPTON,                                   CV.08-1400-PK

                                                    FINDINGS AND
                        Plaintiff,                  RECOMMENDATION

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security
                        Defendant.

_____

PAPAK, Magistrate Judge:

      Plaintiff Cynthia Frampton ("Frampton") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for disability

insurance benefits and supplemental security income under Titles II and XVI of the Social

Security Act. This court has jurisdiction to review the Commissioner's decision pursuant to 42

U.S.C. § 405(g). Following a careful review of the record, and for the reasons set forth below,

the Commissioner's decision should be affirmed.

Page 1 - FINDINGS AND RECOMMENDATION

## BACKGROUND

Cynthia Frampton was born in 1962. Tr. 575. She completed twelfth grade and has a high school diploma. *Id.* Frampton's work history consists of a variety of jobs, including a tanning salon attendant, floral deliverer, cashier, night watch person, and coffee barista. *Id.* at 576-586. At the time this case was initiated, she was working "on call" as a flower delivery person and tanning salon attendant. *Id.* at 576-578.

Frampton filed her current application for disability insurance benefits on October 29, 2004, alleging a disability onset date of August 27, 2004. *Id.* at 71-76. The claim was denied initially and on reconsideration. *Id.* at 43-58. On August 29, 2007, a hearing was held before an Administrative Law Judge ("ALJ"), who took testimony from Frampton, who was represented by an attorney, and from a vocational expert. *Id.* at 15. On April 18, 2008, the ALJ issued a decision finding Frampton not disabled. *Id.* at 12-28.

The ALJ engaged in the required five-step "sequential evaluation" process when she evaluated Frampton's application. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At step one, the ALJ concluded that Frampton had not engaged in any substantial gainful activity since her alleged disability onset date of August 27, 2004. Tr. 17. At step two, the ALJ determined that Frampton's medical impairments of fibromyalgia and chronic pain were "severe" for purposes of the Act. *Id.* She also found that Frampton suffered from depression, a "non-severe" impairment. *Id.* at 18.

At step three, the ALJ found that none of Frampton's impairments were the equivalent of any of the listed impairments enumerated in 20 C.F.R. § 404, Subpt. P, App. 1. *Id.* at 19. The ALJ then properly conducted an assessment of Frampton's residual functional capacity ("RFC").

Page 2 - FINDINGS AND RECOMMENDATION

Specifically, the ALJ found that:

> [Frampton] has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except that [Frampton] is able to sit for at least two hours at a time for eight hours in an eight-hour day with minimal breaks.  [Frampton] is able to stand or walk for at least one hour at a time for eight hours in an eight-hour day – [Frampton] must be able to then simply change positions but not for a particular period of time.  [Frampton] is able to lift 20 pounds occasionally and lift 10 pounds frequently.  [Frampton] is able to perform frequent postural activities and physical functions of work.  [Frampton] has no manipulative, vision, communication, or environmental limits.  [Frampton] is able to think clearly enough to question others, make decisions on conditions imposing potential harm to others, and follow guidelines.  [Frampton] is sufficiently alert to drive and follow delivery instructions.  [Frampton] is able to learn new products and procedures and get along well enough with people to explain new products and make sales.

*Id.* The ALJ further concluded that Frampton's account of her symptoms was not fully supported by objective evidence, and, accordingly, the ALJ found Frampton not fully credible based upon the medical and opinion evidence in the record.

At step four, the ALJ concluded that Frampton may be able to perform past relevant work, but that the prior work she could do did not qualify as past relevant work.  *Id.* at 23.  In clarifying this finding, the ALJ noted that Frampton had the ability to perform past relevant work under her current RFC, but since she did not perform at the "substantial gainful activity level" at her previous employment, that employment did not qualify as "past relevant work" for purposes of the Act.  *Id.*

At step five, the ALJ found that considering Frampton's age, education, work experience, and RFC, she was capable of performing other work that exists in significant numbers in the national economy.  *Id.*  The ALJ relied upon the objective Vocational Expert's ("VE") testimony that Frampton could perform the requirements of occupations such as food assembler, wiring

harness assembler, and order filler. *Id.* at 24. Based on these findings, the ALJ concluded that

Frampton was not disabled. *Id.*

      After the Appeals Council denied review, Frampton filed for review of the final decision

in this court on November 28, 2008.

## STANDARD OF REVIEW

      The district court must affirm the Commissioner's decision if it is based on proper legal

standards and the findings are supported by substantial evidence in the record. 42 U.S.C. §

405(g); *Bray v. Comm'r Soc. Sec. Admin.*, 554 f.3d 1219, 1222 (9th Cir. 2009). "Substantial

evidence means more than a mere scintilla, but less than a preponderance; it is such relevant

evidence as a reasonable person might accept as adequate to support a conclusion." *Lingenfelter

v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citing *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880,

882 (9th Cir. 2006)). The court must weigh all of the evidence, whether it supports or detracts

from the Commissioner's decision. *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008.)

The Commissioner's decision must be upheld if it is a rational interpretation of the evidence,

even if there are other possible rational interpretations. *Magallanes v. Bowen*, 881 F.2d 747, 750

(9th Cir. 1989). The reviewing court may not substitute its judgment for that of the

Commissioner. *Robbins*, 466 F.3d at 882. Finally, "the court will not reverse an ALJ's decision

for harmless error, which exists when it is clear from the record that the ALJ's error was

inconsequential to the ultimate nondisability determination." *Tommasetti*, 533 F.3d at 1038

(citation omitted).

      The ALJ is responsible for determining credibility, resolving conflicts in medical

testimony, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

In determining a claimant's RFC, an ALJ must consider all of the relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883 (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5); 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).

## DISCUSSION

Frampton contends that the ALJ erred in concluding that she had the RFC to perform modified light work. The RFC assessment describes the work-related activities a claimant can still do on a sustained, regular and continuing basis, despite the functional limitations imposed by her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p. The ALJ must reach the RFC assessment based on all the relevant evidence in the case record, including medical reports and the effects of symptoms, including pain, that are reasonably attributable to medically determinable impairments. *Robbins*, 466 F.3d at 883. The ALJ, however, need not incorporate limitations identified through claimant testimony or medical opinions that the ALJ permissibly discounted. *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004).

Here, Frampton argues that the ALJ erred by improperly rejecting the medical opinions and ultimate conclusions of one of her treating physicians, Dr. Michael Kent. Frampton further asserts that the ALJ erred by discrediting Frampton's testimony regarding her symptoms, and failed to properly account for the lay witness testimony of her husband James. Finally, Frampton argues that the ALJ failed to develop the record about Frampton's alleged mental impairments, and failed to analyze Frampton's abilities on a function-by-function basis.

/ / /

Page 5 - FINDINGS AND RECOMMENDATION

I.    **Opinion of Treating Physician Dr. Kent**

Frampton argues that the ALJ erred when she rejected the opinion of one of her treating physicians. In weighing a claimant's medical evidence, the ALJ generally affords enhanced weight to the opinions of the claimant's treating physicians. *See* 20 C.F.R. § 404.1527(d)(2). "Those physicians with the most significant clinical relationship with the claimant are generally entitled to more weight than those physicians with lesser relationships." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008). In consequence, an uncontradicted treating physician's opinion may only be rejected for "clear and convincing" reasons supported by evidence in the record, and a contradicted treating physician's opinion may only be rejected for "specific and legitimate" reasons supported by evidence in the record. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)). Moreover, several factors determine the weight the ALJ should give to a physician opinion, including the length of the treatment relationship and frequency of examination, the amount of evidence that supports the opinion, the consistency of the medical opinion with the record as a whole and the physician's specialty and understanding of the disability program. *Orn v. Astrue*, 495 F.3d 625, 631-632 (9th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)).

Here, the ALJ's RFC determination rejected the opinion of Frampton's treating physician, Dr. Kent, that Frampton was unable to perform light work, due to severe depression. Tr. 21-22. Dr. Kent's opinion is inconsistent with the opinion of the state agency reviewing physician, Dr. Jeff Clausel, Ph.D, who indicated that Frampton had no major limitations in daily living or work related activities. *Id.* at 18, 20, 356, 493. Thus, I review the ALJ's decision to determine whether she set fort specific and legitimate reasons to reject Dr. Kent's opinion, and whether

substantial evidence supports those reasons.

The ALJ discounted Dr. Kent's opinion because it was "inconsistent with itself and with other evidence." *Id.* at 21. An ALJ may properly discount a physician opinion based upon discrepancies between the opinion and the physician's treatment notes. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). A treating physician's opinion may be rejected if based "to a large extent" on claimant's self-reports that have been properly discredited or if based upon an "incongruity" between physician's questionnaire responses and the medical record. *Tommasetti*, 533 F.3d at 1041.

Here, the ALJ cited specific and legitimate reasons for her decision to reject Dr. Kent's opinion. The ALJ found Dr. Kent's treatment notes inconsistent because "at one point, he stated that claimant had 'no acute illness' under Axis III, but then later assessed her with a 'Major Depressive Disorder with a GAF of 45 . . . [with] clinical findings that included a flat affect, low mood, and self-harm thoughts.'" Tr. 21. Additionally, for many visits, Dr. Kent's treatment notes indicated that Frampton was "fairly bright and animated," and Dr. Kent even observed that at times, Frampton was a "little overly dramatic about her symptoms." *Id.*

Substantial evidence in the record supports the ALJ's finding that Dr. Kent's opinion was inconsistent with his treatment notes and the medical record. In 2004, when Frampton returned to Dr. Kent after nearly three years, she revealed to him that she had lied to him when he initially evaluated her prior to her gastric bypass surgery in 2001. *Id.* at 501. Between October 2004 and June 2006, Dr. Kent saw Frampton on a monthly basis, and regularly adjusted her medication regime. *Id.* at 495-501, 562-569. With the exception of his recommendation that Frampton be evaluated for electroconvulsive therapy, Dr. Kent's treatment notes are largely devoid of any

observations regarding Frampton's social functioning, ability to engage in work-related activities or activities of daily living. *Id.* at 495-501, 562-569, 537-539. Nor do his notes provide evidence of the three episodes of decompensation he refers to in the May 2006 Medical Impairment Questionnaire. *Id.* Dr. Kent's opinion was primarily premised upon Frampton's subjective complaints, and included no objective testing or independent medical findings.

Additionally, as discussed more fully below, Dr. Kent's opinion is directly contradicted by several other examining physicians who examined Frampton and determined that despite exhibiting some symptoms of depression, she suffered no limitations in daily living or completion of work-related activities. Frampton urges the court to consider that DDS physician Dr. Sharon Eder provided support for Dr. Kent's opinion in a 2004 Residual Functional Capacity Assessment form, where she checked the box indicting that Frampton required a "hand-held assistive device" for ambulation. Pl.'s Op. Brief, p. 10; Tr. 433. However, the record is not entirely clear whether Dr. Eder indeed checked that box, or checked the box above it which instead indicated that Frampton was able to stand or walk for a total of six hours in an eight-hour workday. Tr. 433. Given that Dr. Eder otherwise indicated that Frampton suffered only occasional postural and exertional limitations, and ultimately concluded that Frampton had "no impairment which meets or equals listings," it appears inconsistent that she would have checked the box requiring the hand-held assistive device. Accordingly, I do not find Dr. Eder's RFC assessment lends support to Dr. Kent's opinion.

The record also supports the ALJ's finding that Dr. Kent provided no basis for his conclusion that Frampton's depression was so severe that she could not perform light work and would be absent from work more than four times per month, and would be at least moderately

impaired in most of her work-related abilities. *Id*. at 22. The ALJ rejected Dr. Kent's opinion

that Frampton would have difficulty working with others due to her psychiatric condition,

because the record reflected that Frampton had "held several jobs that require[d] substantial

contact with others." *Id*. at 21-22. The record reflects that while in Dr. Kent's care, Frampton

worked intermittently delivering flowers and as a tanning salon attendant, where she was

required to sit or stand for an entire shift, drive alone for at least 15 miles, and she regularly

interacted with others, including explaining and selling products. *Id*. at 576-581. While

Frampton did not always work a full work week, she often worked for several days at a time,

usually for a full eight-hour shift. *Id*. Of particular note, Frampton had been employed off and

on at the tanning salon since 1998, indicating that despite any troubles she may have been

experiencing with depression, pain, and lack of sleep, her work-related abilities were not

impaired. The ALJ rationally concluded that Dr. Kent lacked support for his opinion that

Frampton was incapable of light work, and that in fact, the record contained evidence which

directly contradicted his opinion.

The ALJ cited specific and legitimate reasons to discount Dr. Kent's opinion. Substantial

evidence in the record supports those reasons. Accordingly, I conclude that the ALJ's rejection

of Dr. Kent's opinion was not improper.

## II.    Claimant Credibility

The ALJ found that Frampton's account of the intensity, persistence, and limiting effects

of her symptoms was not fully credible. Frampton argues that the ALJ erred by failing to

articulate specific reasons supported by the record for discrediting Frampton's testimony

regarding her symptoms. At the hearing, Frampton testified that she had daily headaches,

Page 9 - FINDINGS AND RECOMMENDATION

chronic diarrhea, twice daily "charley horses," pain between her shoulders, a knee injury, brittle

bones as a result of gastric bypass surgery, numbness and tingling in her arms, pain in her right

leg, achy bones, and her legs locked up on her. Tr. 20. She further testified that she suffered

from depression, was emotionally unstable, had attempted self harm on two occasions, had daily

anger problems and crying spells, was forgetful, dropped things, and fell down twice a month.

*Id.* She also reported that she did not have the strength to do a 40-hour a week job, was tired and

weak in the morning, could stand for 20 to 25 minutes, walk to the end of her block, and sit for

15 to 20 minutes. *Id.*

When a claimant's medical record establishes the presence of a "medically determinable

impairment" that "could reasonably be expected to produce the [claimant's alleged] pain or other

symptoms," the ALJ must evaluate the claimant's credibility in describing the extent of those

symptoms. 20 C.F.R. § 404.1529. In the event the ALJ determines that the claimant's report is

not credible, such determination must be made "with findings sufficiently specific to permit the

court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v.

Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46

(9th Cir. 1991) (*en banc*)). Unless the record has affirmative evidence of malingering, the ALJ

must offer specific, clear and convincing reasons for rejecting the claimant's testimony about the

severity of her symptoms. *Carmickle*, 533 F.3d at 1160.

When making a credibility evaluation, the ALJ may consider objective medical evidence

and the claimant's treatment history as well as any unexplained failure to seek treatment or

follow a prescribed course of treatment. *Smolen*, 80 F.3d at 1284. In weighing a claimant's

credibility, the ALJ may  also consider the claimant's daily activities, work record, and

observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations. *Id.* In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id., see also* SSR 96-7p. While a finding that a claimant lacks credibility cannot be premised solely on a lack of medical support for the severity of pain, *see Lester*, 81 F.3d at 834, where the ALJ's credibility finding is supported by substantial evidence in the record, the finding will not be disturbed, *Thomas*, 278 F.3d at 959 (citing *Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999)).

Here, the ALJ found that Frampton's medically determinable impairments could reasonably be expected to produce the alleged symptoms. Tr. 20. The ALJ concluded that Frampton's testimony concerning the intensity, persistence, and limiting effects of her symptoms was not credible to the extent that it conflicted with the ALJ's RFC assessment. *Id.* The ALJ explained that she rejected the testimony based upon the observations of medical professionals who examined Frampton, and the opinion evidence given by Frampton and her husband. *Id.* at 20-23. However, the ALJ did not find that Frampton was malingering, nor do I find affirmative evidence of malingering in the record. Thus, the ALJ was required to set forth "clear and convincing" reasons to reject Frampton's testimony regarding the severity of her symptoms.

In discrediting Frampton's account of the severity of her symptoms, the ALJ relied upon several treating physician's observations and opinions regarding her abilities and propensity to exaggerate the severity of her symptoms. Notably, the ALJ relied extensively upon Dr. Clausel's psychological reports, where in 2003, he observed that Frampton "had been able to function

occupationally and domestically for many years at a rather adapted level, to the point of holding jobs, for instance, for four to six years continuously." *Id.* at 20. Dr. Clausel noted in 2005 that despite Frampton's self report that she "could just barely function," she had been employed at various jobs since his last examination, each of which included contact with the public. *Id.* at 21. The ALJ found it significant that in both reports, Dr. Clausel's notes described discrepancies in Frampton's reported symptoms during his examinations of her, including that his observation that her statement regarding her inability to function was not compatible with the "alert, effective, task competent behavior" she exhibited in the interview, leading him to conclude that "outright malingering could not be definitively identified, although symptom magnification for secondary gain was clearly indicated, especially given the incongruence between the claimant's clinical presentation [versus] her subjective complaints." *Id.* at 20-21. Dr. Clausel also thought that Frampton was intentionally underperforming during many of the objective tests he administered, leading him to suspect that she was exaggerating the difficulty she was experiencing in performing tasks related to intelligence, reasoning, attention span, and short-term memory. Tr. 490-491.

The ALJ also discussed Dr. Michael Sant's December 2003 physical examination of Frampton. Dr. Sant's x-rays revealed some mild degenerative changes at L5-S1, with some disc space narrowing, providing support for Frampton's complaints of back pain. *Id.* The ALJ could reasonably find this minimal objective evidence inconsistent with Frampton's claim that her pain was so severe as to prevent her from engaging in any sustained physical activity. Such a lack of evidence is not sufficient by itself to discredit Frampton's account of her symptoms, but it is a proper factor for the ALJ to consider in evaluating credibility. Additionally, Dr. Sant noted that

Page 12 - FINDINGS AND RECOMMENDATION

despite Frampton's complaints of severe back pain when standing, Frampton was still working part-time at Starbucks, which required her to stand most of the time, and she was exercising by walking several days a week. *Id.* at 20-21.

The ALJ's conclusion that Frampton's symptoms were not as severe as she represented them was supported by the opinions of DDS physicians Sharon Eder, M.D., Linda Jenson, M.D., Martin B. Lahr, M.D., M.P.H., and Frank G. Lahman, Ph.D, who each concluded that despite Frampton's complaints, she was capable of light to medium work with occasional postural and functional limitations, and that Frampton's depression was non-severe. *Id.*

The ALJ further relied upon Dr. Smithson's July 2007 treatment notes, which reflected that at the time he examined Frampton, she was in the process of trying to obtain SSI for mental illness and back problems. *Id.* at 22. Frampton reported to Dr. Smithson that she slept about two hours a night, and that while she used to see Dr. Kent for depression treatment, but hadn't seen him in about a year because she was upset that she received a bill when she cancelled an appointment at the last minute. *Id.* Dr. Smithson observed that "she's showing very poor judgment by simply choosing not to take her thyroid meds," and he suspected that her sleep problem may well be symptomatic of mania. *Id.* at 556. He recommended that she continue seeing her psychiatrist, Dr. Kent, or become established with someone new, and encouraged her to resume taking her thyroid medication. *Id.* at 557-558. The ALJ found it significant that no evidence in the record indicated that Frampton followed Dr. Smithson's advice to continue to receive psychiatric treatment. *Id.* at 22. Nor did not Frampton get a second opinion regarding Dr. Kent's suggestion that she needed electroconvulsive therapy. *Id.* The ALJ rationally concluded that Frampton's propensity to exaggerate the severity of her symptoms and poor

compliance with referrals and follow up care reasonably cast doubt upon the sincerity of her

claim of disabling symptoms.

In addition to the medical evidence and observations of numerous physicians, the ALJ

found that the opinion evidence given by Frampton and her husband was not credible to the

extent that it conflicted with the ALJ's RFC assessment.  Specifically, the ALJ questioned

Frampton's own inconsistent statements, including her self-report in 2003 that she was doing

well after her surgeries until she went back to work where she was required to stand most of the

time, yet was currently working at a part-time job that required considerable standing and

reported that her symptoms were relieved by a hot shower.  *Id.* at 20.  The ALJ also found it

significant that Frampton had lied to Dr. Kent, one of her treating physicians, thereby further

calling the credibility of her self-reports into question.  *Id.* at 18.

The ALJ also considered Frampton's own account of her work history and abilities,

including that she had held several jobs that required "substantial contact with others."  *Id.* at 21.

Despite Frampton's report that her depression prevented her from engaging in normal social

interactions, she been employed as a sales clerk at Starbucks but left not because of social

anxiety, but "because she was not getting enough hours."  *Id.*  Similarly,  she left a cashier job

because her back hurt and she was told she asked too many questions, and she "felt like . . . an

outsider."  *Id.* at 21, 588. The record indicates that Frampton's alleged difficulties with normal

social interaction did not prevent her from working in customer service at a local tanning salon

off and on for seven years, including sometimes working for a full week at a time.  *Id.*  Frampton

testified as to her abilities at the hearing, stating that she drove about 15 miles a day when she

worked at the Flower Box, working approximately eight hours a day when she filled in there.  *Id.*

at 576.  She also testified that on occasion she worked three days or an entire week at the tanning

salon, closing the shop early for a few hours and returning later.  *Id.* at 589.  Her duties required

her to check people in, clean the tanning beds, answer the phone, learn maintenance and tanning

guidelines, sell products, and take money.  *Id.* at 577-79.

 In sum, the ALJ's reasoning satisfies me that she did not arbitrarily discount Frampton's

assertions.  She considered proper factors and drew logical inferences supported by a rational

interpretation of substantial evidence in the record, including the observations of Frampton's

physicians which demonstrated Frampton's poor compliance with treatment recommendations

and propensity to exaggerate the severity of her symptoms, as well as Frampton's own statements

about her work history and limitations.  While not the only rational interpretation of the evidence,

the ALJ's reasoning is clear and convincing.  Therefore, I do not disturb the ALJ's credibility

finding.

**III. Frampton's Husband's Testimony**

 Frampton argues that the ALJ improperly rejected her husband's testimony in assessing

her RFC.  Lay testimony of witnesses, including family members, about their own observations

regarding the claimant's impairments must be considered by the ALJ.  *Smolen*, 80 F.3d at 1288.

Testimony from lay witnesses who see the claimant on a regular basis is of particular value,

because they can often ascertain whether the claimant is malingering or truly suffering.  *Dodrill*

*v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  If an ALJ chooses to discount the statements of lay

witnesses, the ALJ must give "germane reasons" for discrediting the testimony.  *Lewis v. Apfel*,

236 F.3d 503, 511 (9th Cir. 2001).  Inconsistency with medical evidence is considered a

"germane" reason for discrediting lay witness testimony.  *Bayliss*, 427 F.3d at 1218 (citing *Lewis*,

Page 15 - FINDINGS AND RECOMMENDATION

236 F.3d at 511).

In a third-party Function Report dated December 2, 2004, Frampton's husband, James, reported that Frampton was depressed, reclusive, suicidal, and heard voices. Tr. 175, 177. He noted that she often needed reminders to take her medications, help dressing herself, and could prepare meals and perform daily chores only with his assistance. *Id.* at 173. He reported that despite taking medications, she could not sleep. *Id.* at 172. He indicated that while Frampton drove a car, she did so only when necessary. *Id.* at 174. Because of her back surgeries, she experienced difficulty lifting, squatting, sitting, kneeling, using her hands, completing tasks, and had trouble with memory and concentration. *Id.* at 176. He also reported that Frampton was only able to walk three blocks before needing to rest for 20 minutes, and could only pay attention for about ten minutes at a time.

The ALJ terminated the hearing, prior to hearing James' testimony. *Id.* at 612. In a supplemental interview on September 6, 2007 James testified that Frampton has trouble walking and "limps really bad" as a result of a broken knee. *Id.* at 304. He reported that she is "really weak" and cannot walk more than two blocks. *Id.* He further explained that Frampton has difficulty using her arms and hands, due to them being "shaky," which causes her to drop things such as silverware, plates, and cups. *Id.* at 304-305. He described that he observed her suffering pain by the "looks on her face," and reported that she appeared to be bothered by pain about 85% of the time. *Id.* at 305. He often witnesses Frampton's crying spells, occurring two to three times a day, lasting 20 minutes each time, and indicated that the crying spells seemed to be increasing. *Id.* at 306. He further reported that she has problems with anger control and irritability, which flare up once or twice a day, lasting about 30 minutes, and which are usually

triggered when she gets frustrated that she cannot complete something. *Id*. at 307. James indicated that Frampton has problems with memory, attention span, and concentration, and had recently forgot to turn the burners off on the stove while cooking dinner. *Id*. at 307-308. Finally, he was concerned that she "gets very depressed," and sometimes expressed that she wished that she was dead. *Id*. at 308.

Here, the ALJ did not disregard James' statements without comment. Instead, she excerpted portions of James' testimony, and indicated that she gave very little weight to them, because his statements "are inconsistent with medical evidence and claimant's own reports of her work abilities." *Id*. at 22. Based upon the close similarity of James' statements to Frampton's own subjective complaints of her symptoms, and the fact that the ALJ discussed both Frampton and James' testimony together in her opinion, I take this to mean that the ALJ considered James' statements to be of the same nature and rejected them for the same reasons Frampton's subjective statements were rejected. In light of the conclusion that the ALJ's reasons for discounting Frampton's statements were clear and convincing, it follows that the same reasons provide sufficient justification for the ALJ's evaluation of James' lay statements. Accordingly, remand is not warranted on this issue.

## IV.    Failure to Develop the Record Regarding Alleged Mental Impairments

Frampton argues that the ALJ failed to satisfy her duty to fully develop the record by dismissing the functional limitations associated with Frampton's alleged mental impairments, and by failing to secure a medical expert. It is well established that an ALJ has a "special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir.

2001) (citing *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *Brown v. Heckler*, 713

F.2d 441, 443 (9th Cir. 1983)).  However, the ALJ's duty to further develop the record is

"triggered only when there is ambiguous evidence or when the record is inadequate to allow for

proper evaluation of the evidence."  *Id.*, 276 F.3d at 459-460; *see also Smolen*, 80 F.3d at 1288

(ALJ erred by rejecting physician opinion for lack of foundation instead of further developing the

record so he could properly evaluate the opinions).  The ALJ may "discharge this duty in several

ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's

physicians, continuing the hearing, or keeping the record open after the hearing to allow

supplementation of the record."  *Tonapetyan*, 242 F.3d at 1150.

       Here, the ALJ's duty to further develop the record was not triggered.  Frampton does not

argue that the record was ambiguous or inadequate to allow for a proper evaluation of the

evidence.  Instead, Frampton cites to evidence in the record that the ALJ rejected.  This suggests

that the record was fully developed, and that the crux of Frampton's argument is that the ALJ did

not give the evidence favorable to Frampton the weight Frampton desired.  However, this does

not trigger the ALJ's duty to further develop the record.  In formulating her opinion, the ALJ

cited the record extensively, relying upon several different physician opinions regarding

Frampton's alleged psychological impairments, including Dr. Clausel's 2003 and 2005

psychological evaluations, Dr. Kent's treatment notes, and Dr. Robert Henry's 2004 Psychiatric

Review Technique evaluation, all of which revealed to the ALJ that Frampton's symptoms were

exaggerated.  Tr. 18.  In the RFC assessment at step three of the sequential evaluation process,

the ALJ  discussed Frampton's alleged mental impairments related to work-related functions in

detail, and she accounted for the existence of a pain disorder.  *Id.* at 19-23.  Additionally, the ALJ

Page 18 - FINDINGS AND RECOMMENDATION

left the record open for three weeks after the hearing to allow Frampton's counsel to supplement

the record. *Id.* at 613. This satisfied the ALJ's duty to fully and fairly develop the record. *See*

*Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1998) (ALJ satisfied duty to fully and fairly develop

record by keeping record open after hearing to allow supplementation of record.). Accordingly,

remand or reversal on this basis is unwarranted.

## V.     Failure to Properly Formulate Plaintiff's RFC

Frampton contends that the ALJ's determination of her RFC was in error because she did

not perform a function-by-function analysis pursuant to SSR 96-8P. She further maintains that

the ALJ erred when she failed to address all of plaintiff's impairments and resulting limitations.

A reviewing court "will affirm the ALJ's determination of [the claimant's] RFC if the ALJ

applied the proper legal standard and the decision is supported by substantial evidence." *Bayliss*

*v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). An ALJ is not required to perform function-

by-function analysis prior to determining a claimant's RFC, so long as the ALJ took into account

those limitations for which there was record support and did not depend upon claimant's

subjective complaints. *Id.* Similarly, an ALJ is not required to perform such an analysis for

medical conditions for which the ALJ found neither credible nor supported by the record. *Id.*

Here, the ALJ's finding that Frampton's RFC included the ability to perform light work

was supported by substantial evidence, as the ALJ took into account those limitations for which

there was record support that did not depend on Frampton's subjective complaints, namely

fibromyalgia and chronic pain. Furthermore, the ALJ considered Frampton's non-severe

impairment, depression, but found that Frampton's account of the severity of her symptoms not

credible and not supported by the record, as discussed in detail above. The ALJ was not required

Page 19 - FINDINGS AND RECOMMENDATION

to further analyze those impairments that were based upon Frampton's subjective complaints and for which she did not find supported by the record. The ALJ's RFC finding was consistent with the overall conclusion of numerous physicians that Frampton suffered only mild limitations and was able to perform light or medium work. The ALJ properly accounted for these limitations in her RFC determination, by specifically addressing numerous postural and exertional limitations. I conclude that the ALJ properly formulated Frampton's RFC, making remand or reversal unwarranted.

## RECOMMENDATION

For the reasons set forth above, the Commissioner's decision should be AFFIRMED and judgment should be entered dismissing this case with prejudice.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 21st day of December, 2009.

Paul Papak
United States Magistrate Judge

Page 20 - FINDINGS AND RECOMMENDATION